1

2

3

4

5

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BITCO GENERAL INSURANCE
CORPORATION,

                    Plaintiff,

        v.

UNION RIDGE RANCH, LLC and
INLAND COMPANY,

                    Defendants.

CASE NO. C22-05624 BHS

ORDER

14

15

16

17

18

19

20

21

22

This matter is before the Court on defendant Inland Company's motion for partial summary judgment, Dkt. 24, and Plaintiff BITCO General Insurance Corporation's motion for partial summary judgment, Dkt. 35.

The central issue before the Court is whether Inland's BITCO's insurance policies[1] cover damage that Inland caused to Union Ridge Ranch (URR). Inland improperly constructed retaining walls on URR's property, one of which failed. The

---

[1] Inland had a BITCO Comprehensive General Liability (CGL) policy and an umbrella policy. Both had the same coverages and exclusions, and they will be referenced in the singular for clarity and ease of reference.

policy includes an "Impaired Property" exclusion which excludes from coverage property that is "less useful" because it incorporates Inland's defective work. Dkt. 1-1 at 55. An exception to this exclusion applies if Inland can prove the "loss of use of other property arising out of sudden and accidental physical injury" to Inland's work or product after it has been put to its intended use. Dkt. 1-1 at 63. Inland concedes that not only the failed retaining wall but "the complete parcel" of land falls within the definition of impaired property. Dkt. 24 at 11. But it argues that the failure of the retaining wall satisfies the sudden and accidental injury exception to the impaired property exclusion. *Id*. at 12–13. The Court disagrees. For the reasons explained below, it concludes that the exception does not apply and that the impaired property exclusion bars coverage here.

## I.   BACKGROUND

URR owned real property in Ridgefield, Washington which it planned to develop and sell to a buyer to construct homes (the Project). Dkt. 1-2 at 3–4. It hired Inland in the summer of 2018 to perform infrastructure work on its land including constructing retaining walls as well as storm, sewer, water, sitework, earthwork, rock, paving and concrete work. Dkt. 26-11 at 3.

URR made its first attempt to sell the Project in October of 2018. Dkt. 1-2 at 23. As part of due diligence, the purchaser commissioned a geotechnical analysis of the project. *Id*. The report "identified numerous defects and deficiencies with [Inland's] work, including but not limited to, the retaining walls were not built correctly and in accordance with the approved design plans, there was a substantial risk of future wall failures and displacements, particularly during the wet winter season, and other defects."

1  *Id.* The buyer terminated its agreement to purchase the project in November 2018 due to

2  the defects identified in Inland's work by the report. *Id.*

3       URR met with Inland in November 2018 to point out the defects in Inland's work,

4  discuss the buyer's cancelation, and address cost overruns and funding problems. Dkt. 1-

5  2 at 23. In addition to the retaining wall issues uncovered by the geotechnical report,

6  URR concluded Inland had also failed to provide adequate manpower for tasks, to adhere

7  to timelines, and to provide accurate invoices and records to URR. *Id.* Inland agreed to

8  work with URR on a reduced final contract price. *Id.*

9       On January 17, 2019, URR and Inland discovered that one of the retaining walls

10 (Wall 4) had failed. Dkt. 1-2 at 24. They were on the site to discuss the Project, and the

11 issues with the retaining walls, when they allegedly[2] discovered that the central portion of

12 Wall 4 was bulging with water pooling at its top. *Id.*; Dkt. 24 at 6. At that time, only the

13 central portion of the wall was constructed, the "wings" were not yet in place. Dkt. 24 at

14 6 n.2. By February 2019, a Project engineer opined that "the entire wall No. 4 has been

15 compromised." Dkt. 39-4 at 2.

16      The failure of Wall 4 necessitated a redesign and rebuild. The rebuilding of the

17 wall did not begin until several months after January 2019. Dkt. 25 at 8, 10. URR

18 commissioned a report (J2 report) to analyze what went wrong with the project with

19

20      [2] Inland cites to "Vial Dec, Ex 1, page 4 (J2 Report)" to support its assertion that the wall
was seen "bulging" with water "pooling" on top. It does not specify which Vial declaration. In
21 any event, page 4 of the J2 does not include any reference to bulging or pooling with Wall 4. A
word search in the J2 report for "bulge" or "pool" came up with zero results. Inland made no
correction when BITCO pointed this out. Dkt. 31 at 11 n.5. Consequently, the Court does not
22 assume the truth of those details.

1   regards to "standard of care for design professionals, construction and general design

2   errors, design and construction delays, and contract administration standards of care."

3   Dkt. 25 at 3. It concluded that "the improper installation of this wall ultimately led to

4   prospective buyers losing confidence in the project, extending the construction duration

5   too far and ultimately led to the developer [Union Ridge] losing the property [.]." *Id*. at 8.

6   In February 2019, Soil & Water Technologies, Inc. (SWT), the geotechnical consultant

7   hired by the Project engineer, issued a report that determined that all the retaining walls

8   were still defective. Dkt. 1-2 at 24.

9          As winter 2019 wore on, tensions rose between Inland and URR. Inland demanded

10   payment for its work and money for the necessary adjustments and URR refused to pay

11   for future work or work that it deemed improper and demanded an economical solution

12   for the damage already done. Dkt. 1-2 at 24–25. In March 2019, Inland filed four Claims

13   of Lien against the project. Dkt. 1-1 at 25.

14          On April 2, 2019, Inland sued URR in Clark County Superior Court, asserting

15   breach of contract and quantum meruit claims and seeking to foreclose on its lien. Dkt.

16   37 at 3–17.

17          A few weeks later in April 2019, URR found a second potential purchaser who

18   agreed to purchase the Project contingent on due diligence. Dkt. 1-2 at 26. Inland refused

19   to withdraw its liens against the Project which would have allowed the Clark County

20   Recorder's office to officially record the Project for sale. *Id*. It also had not yet completed

21   the retaining walls by May 2019. *Id*. This second purchaser did not buy the Project. *Id*.

22

1    Between April and July 2019, URR continued to demand that Inland complete the

2    Project and repair the retaining walls and related elements. Dkt. 1-2 at 26–27. Inland

3    refused until May and June of 2019 when it attempted to rebuild and repair all of the

4    retaining walls. *Id*. at 26.

5    In June 2019, URR found a third potential buyer. That buyer commissioned

6    geotechnical testing of the Project which confirmed that the walls were still not

7    constructed correctly and that they would fail in the future. Dkt. 1-2 at 27. URR

8    ultimately sold the project, but for a reduced price in order to account for re-building and

9    repairing all of the retaining walls. *Id*.

10   **A.    URR's Counterclaims against Inland**

11   In its July 2019 answer to Inland's suit, URR asserted breach of contract and

12   negligence counterclaims. It claimed Inland's poor work on not just the retaining walls

13   but in varied aspects of construction that had made it impossible to sell the project at a

14   profit and sought $2,007,085.10 in damages. Dkt. 1-2 at 20–34.

15   Its breach of contract counterclaim alleged that the "labor and materials" from

16   Inland failed to comport with the contract because:

17        a) The labor and materials failed to comply with industry standards and
             applicable building codes, and were not constructed in a good and
18           workmanlike manner;
          b) The work was not completed;
19        c) The work was not completed in one or more of the following
             particulars:
20              (i)    The hook-up and utility connection for the Clark Regional
                       Wastewater District was not completed;
21              (ii)   The landscaping, drainage, and installation of bio retention
                       swells and plant materials for bio retention swell was not
22                     completed;

1

         (iii)    The foundation for Lot 65 was not poured;

         (iv)    The hook-up for utilities at Lot 2 was not completed; and

2

         (v)     The finish clean-up in and around the Project was not
                  completed.

3

Dkt. 1-2 at 28 ¶113. Its negligence counterclaim alleged that Inland knew or should have

4

known:

5

        a)   That the construction defects described in Paragraph 113 above and

6

            elsewhere herein existed;

        b)   The Project was not constructed in compliance with applicable local and

7

            State building  code standards and/or manufacturer's specification and
            was not constructed in a good and workmanlike manner; and

8

        c)   The construction of the Project did not meet industry standards.

9

Dkt. 1-2 at 30. It also alleged under negligence that Inland "failed to repair or correct the

10

construction defects in its work at the Project." *Id*.

11

      URR identified three identical bases for damages for both its breach of contract

12

and negligence counterclaims: (1) that it was "forced to sell the Project" at a "reduced

13

sales price;" (2) that it would pay additional interest and fees to lenders and attorneys;

14

and (3) attorney fees and litigation costs for defending itself against Inland. Dkt. 1-2 at

15

28, 30.

16

**B.**     **Action for Declaratory Relief and Policy language**

17

      Inland tendered defense of URR's counterclaims to BITCO in July 2019. Dkt. 26-

18

1 at 1. BITCO defended under a full reservation of rights. Dkt. 26-3 at 1.

19

      In March 2021, URR and Inland reached a tentative settlement agreement for

20

$2,660,000.00 and a covenant to not execute the judgment against Inland. Dkt. 26-13 at

21

3. Inland assigned any claims against its insurer, BITCO, to URR. *Id*. BITCO did not

22

participate in the settlement discussions and refused to fund the resulting settlement. It

1   reiterated its position that URR's damage was the result of Inland's poor work and that it

2   is not covered under BITCO's policy. *See* Dkt. 1-3 at 30, 40, 44.

3          BITCO then filed a declaratory judgment action in this Court to obtain a judicial

4   determination of its rights and obligations to Inland under its policies in August 2022.

5   Dkt. 1. It seeks a declaration from the Court that it has no duty to indemnify Inland in

6   connection with the March 2021 settlement Inland reached with URR. *Id*. at 2–3. In its

7   Answer, Inland asserted a bad faith claim against BITCO. Dkt. 6 at 10.

8          The parties dispute whether there is coverage under the policy for damages that

9   Inland caused URR and whether BITCO must therefore indemnify Inland for the

10  proposed settlement. The policy defines "property damage" to include "physical injury to

11  tangible property" or the "the loss of use of tangible property that is not physically

12  injured." Dkt. 1-1 at 65.

13         The policy also included an "Impaired Property" exclusion. This excludes from

14  coverage property damage to:

15         (10) "Impaired property" or property that has not been physically injured,
           arising out of:

16             (a)   A defect, deficiency, inadequate or dangerous condition in
                     "your product" or "your work"; or

17             (b)   A delay or failure by you or anyone acting on your behalf to
                     perform a contract or agreement in accordance with its

18                   terms.

19
20  Dkt. 1-1 at 55. The policy defines impaired property as follows:

21         "Impaired Property" means tangible property, other than "your product" or
           "your work," that cannot be used or is less useful because:

22

> a. It incorporates "your product" or "your work" that is known or
> thought to be defective, deficient, inadequate or dangerous; or
> b. You have failed to fulfill the terms of the contract or agreement;
> > If such property can be restored to use by:
> a. The repair, replacement, adjustment or removal of "your product"
> or "your work"; or
> b. Your fulfilling the terms of the contract or agreement

Dkt. 1-1 at 55. Inland concedes that "the property that was the subject of the loss—the complete parcel—falls within the definition of 'impaired property.'" Dkt. 28 at 11. But it argues that the "sudden and accidental physical injury" exception to the impaired property exclusion applies. Dkt. 28 at 11. That exception provides:

> [The impaired property exclusion] does not apply to the loss of use of other
> property arising out of sudden and accidental physical injury to "your
> product" or "your work" after it has been put to its intended use.

Dkt. 1-1 at 63.

**C.    Cross motions for Summary Judgment**

Inland filed a motion for partial summary judgment that seeks a determination that the policy covers damages it caused to URR and that BITCO must therefore indemnify it for the cost of settlement between Inland and URR. Dkt. 24. Inland acknowledges that URR's property did not suffer property damage in the form of "physical injury." Dkt. 32 at 7. It argues instead that URR suffered property damage in the form of "loss of use" of its property after Wall 4 failed. *Id*. As noted above, although Inland concedes that the property meets the definition of impaired property, it argues that the failure of Wall 4 qualifies for the "sudden and accidental physical injury" exception to that exclusion. *Id*. at 11.

1    BITCO responds that there is no coverage because URR "does not allege damages

2  because of 'property damage' as defined in the policy," but instead "only alleges business

3  losses due to URR's disappointed commercial expectations." Dkt. 31 at 3. It argues that

4  even if URR had suffered from loss of use as defined by the policy, coverage is barred by

5  the impaired property exclusion. *Id*. at 3. BITCO's motion for partial summary judgment

6  repeats these arguments.[3] Dkt. 35.

7    URR asserts that the "failure of Wall 4 prevented URR from using the lots to

8  complete its development work and sell the Project to a home builder. While URR's

9  damages are measured in terms of diminished value and lost sales, those damages were

10  caused by URR's inability to use the lots for their intended purpose following the failure

11  of Wall 4." Dkt. 33 at 3. It concedes that the first buyer declined to purchase the Project

12  "due to defects in the retaining walls discovered prior to the failure of Wall 4" yet it

13  argues that it "was unable to sell the project to other, later, buyers, or in one case was

14  asked to take a steep discount, due to the failure of Wall 4." *Id*. at 5.

15

16

17

18    [3] BITCO also argues that the determination of the duty to indemnify is "premature"
because there is no final judgment against Inland or final settlement, Dkt. 31 at 3. Inland argues
19  that BITCO should be judicially estopped from arguing ripeness, Dkt. 36 at 2, but it too initially
asserted in its answer to BITCO's declaratory action that the issues were not ripe because its
settlement was not yet final. Dkt. 6 at 6. The Court concludes that the issue of coverage and
20  related duty to indemnify is ripe. It would be a significant waste of judicial resources to stay
proceedings here and require a final settlement when the Court has all the information it needs to
21  interpret the language of the insurance policy and determine coverage and therefore whether
there is a duty to indemnify. This Order however does not express any opinion on whether the
22  dollar amount of the settlement is reasonable.

1   The Court concludes that the Impaired Property exclusion bars coverage here and

2   that Inland failed to demonstrate that Wall 4's failure qualifies under the "sudden and

3   accidental" injury exception.

## II.   DISCUSSION

### A.   Standard of Review

6   Summary judgment is proper if the pleadings, the discovery and disclosure

7   materials on file, and any affidavits show that "there is no genuine dispute as to any

8   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

9   56(a). In determining whether an issue of fact exists, the Court must view all evidence in

10  the light most favorable to the nonmoving party and draw all reasonable inferences in that

11  party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *Bagdadi v.*

12  *Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where

13  there is sufficient evidence for a reasonable factfinder to find for the nonmoving party.

14  *Anderson*, 477 U.S. at 248.

15  The moving party bears the initial burden of showing that there is no evidence

16  which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*,

17  477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party

18  then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the

19  nonmoving party fails to establish the existence of a genuine issue of material fact, "the

20  moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

21  There is no requirement that the moving party negate elements of the non-movant's case.

22  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving party has met

1  its burden, the non-movant must then produce concrete evidence, without merely relying

2  on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477

3  U.S. at 248.

4  **B.      Interpretation of Insurance Policies**

5        "Interpretation of an insurance contract is a question of law." *Woo v. Fireman's*

6  *Fund Ins. Co.*, 161 Wn.2d 43, 52 (2007). Terms are to be interpreted as the "average

7  person purchasing insurance" would understand them. *Id*. While the insured has the

8  burden of proving that claims fall within a grant of coverage, the insurer has the burden

9  of proving that an exclusion bars coverage. *See McDonald v. State Farm Fire & Cas.*

10  *Co.*, 119 Wn.2d 724, 731 (1992).

11        In Washington, in a declaratory judgment action, the duty to defend is determined

12  by the facts alleged in the complaint. *Indian Harbor Ins. Co. v. Transform LLC*, 2010 WL

13  3584412, at *3 (W.D. Wash. Sept. 8, 2010) (citing *Holland Am. Ins. Co. v. Nat'l Indem.*

14  *Co.*, 75 Wash. 2d 909, 911 (1969)). The insurer is permitted to use the "eight corners

15  rule" to determine whether, on the face of the complaint and the insurance policy, there is

16  an issue of fact or law that could conceivably result in coverage under the policy. *See Xia*

17  *v. ProBuilders Specialty Ins. Co*., 188 Wn.2d 171, 182 (2017) (internal citations omitted).

18  If there is any reasonable interpretation of the facts or the law that could result in

19  coverage, the insurer must defend. *Id*. "[I]f a complaint is ambiguous, a court will

20  construe it liberally in favor of triggering the insurer's duty to defend." *Woo*, 161 Wn.2d

21  at 53. Although an insurer may look outside the complaint if the allegations are

22  contradictory or ambiguous, or if coverage is unclear, the insurer may only rely on

1   extrinsic facts to *trigger* the duty to defend. *Grange Ins. Ass'n v. Roberts*, 179 Wn. App.

2   739, 752 (2013) (quoting *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 52-54 (2007)).

3          The duty to defend is broader than the duty to indemnify, and it arises at the time

4   the action is filed based on the potential for liability. *Woo*, 161 Wn.2d at 52. "If the

5   insurer is unsure of its obligation to defend in a given instance, it may defend under a

6   reservation of rights while seeking a declaratory judgment that it has no duty to defend."

7   *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 761 (2002). "After obtaining a

8   declaration of noncoverage, an insurer will not be obligated to pay from that point

9   forward." *Nat'l Sur. Corp. v. Immunex Corp.*, 176 Wn.2d 872, 885 (2013) (internal

10  quotations omitted).

11         In contrast, the duty to indemnify "exists only if the insurance policy actually

12  covers the insured's liability." *Mut. of Enumclaw Ins. Co. v. Cross,* 103 Wn. App. 52, 58

13  (2000). Determining whether coverage exists under such a policy is a burden shifting

14  process. *McDonald*, 119 Wn.2d at 731. First, the insured bears the burden of showing

15  that its loss falls within the scope of the policy's insured losses. *Id*. If such a showing is

16  made, the insurer can avoid coverage only by showing that "the loss is excluded by

17  specific policy language." *Id*. If successful, the burden shifts back to the insured to prove

18  the applicability of any exception to the exclusion. *Mid-Continent Cas. Co. v. Titan*

19  *Const. Corp.*, 05-CV-1240 MJP, 2009 WL 1587215, at *5 (W.D. Wash. June 5, 2009),

20  *aff'd*, 440 Fed. App'x. 547 (9th Cir. 2011); *MKB Constructors v. Am. Zurich Ins. Co.*, 49

21  F. Supp. 3d 814, 836 (W.D. Wash. 2014).

22

1    "Accordingly, the Court's job is to characterize the perils that allegedly

2    contributed to the claimed loss, and then determine which perils the policy covers and

3    which it excludes." *Westboro Condo. Ass'n v. Country Cas. Ins. Co.*, 2:21-CV-685, 2023

4    WL 157576, at *4 (W.D. Wash. Jan. 11, 2023) (internal citations omitted). To determine

5    the ordinary meaning of an undefined term, our courts look to standard English language

6    dictionaries. *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wn.2d 869, 877 (1990).

7    **C.    BITCO's CGL policy does not cover damages to URR's property resulting
     from Wall 4's failure.**

8    
9        The parties argue three main issues to determine whether BITCO has a duty to

10   indemnify Inland for URR's alleged damages: (1) whether URR's damages are covered

11   under the "property damage" provision of the policy, (2) whether the impaired property

12   exclusion bars coverage anyway, and, if so, (3) whether Inland meets its burden to prove

13   the applicability of the "sudden and accidental physical injury" exception to the impaired

14   property exclusion.

15       Because the Court determines that the impaired property exclusion bars coverage

16   even if URR suffered property damage as defined by the policies, it does not analyze

17   whether URR's alleged loss of use of qualifies as property damage.

18   **D.    The damages at issue are exempt from the insurance policy under the
     impaired property exclusion, and the "sudden and accidental physical injury"
     exception to that exclusion does not apply.**

19   
20       The parties dispute whether the impaired property exclusion in the policy bars

21   coverage. That exclusion bars coverage for property rendered less useful by the insured's

22   own deficient workmanship. Dkt. 1-1 at 55. Again, Inland concedes the property "falls

1   within the definition of 'impaired property.'" Dkt. 24 at 11. It argues however that the

2   "sudden and accidental physical injury" exception to the impaired property exclusion

3   applies, and consequently allows for coverage. *Id*.

4          Inland argues that the exception applies because "Wall #4 had been completed and

5   put to its intended use of providing lateral support to the earth of the lot above it for

6   several months before saturated soil and defects in construction caused the Wall's

7   structural failure-specifically, the bulging-and rendered the adjacent lots unusable." Dkt.

8   24 at 11. It argues that although the wall was improperly constructed, "the coverage

9   triggering 'occurrence' *refers to the event causing injury to the complaining party, not*

10  *the earlier event that created potential for future injury."* Dkt. 32 at 11 (quoting *Walla*

11  *Walla Coll. v. Ohio Cas. Ins. Co.,* 149 Wn. App. 726, 734–35 (2009)) (emphasis in

12  original). Consequently, Inland argues, it does not matter that the wall was under strain

13  and likely to fail due to its faulty construction, "the occurrence was when it actually

14  failed in January of 2019 after months of being in use." *Id*. at 12. Inland argues it is also

15  irrelevant that the original buyer backed out of purchasing the land before the wall failed

16  when it discovered Inland's deficient construction. Dkt. 36 at 17. It contends that the fact

17  that URR could not sell the land at a profit after the wall failed is sufficient to trigger the

18  exception because "a jury could have found that the reduction in value occurred because

19  of the failure of Retaining Wall #4." *Id*.

20         Inland relies on *Walla Walla Coll, v. Ohio Cas. Ins. Co*., 149 Wn. App. 726

21  (2009), to argue that Wall 4's rupture is a sudden and accidental occurrence. In *Walla*

22  *Walla* an underground gasoline storage tank ruptured ten years after it was installed in

1    Walla Walla College and caused substantial property damage. *Id*. at 728. The tank

2    ruptured after the policies expired. *Id*. Walla Walla College argued that the damages to

3    surrounding property when the tank ruptured were covered because experts had

4    concluded that failures during installation damaged the tank and started a "continuing

5    process" that ultimately caused it to rupture. *Id*. It argued that coverage for the property

6    damage post rupture was triggered when the tank was damaged during installation, not

7    when it later ruptured. *Id*. The court disagreed. It held that that "property damage under

8    the policies occurred when the tank leaked, thus, after the liability coverage expired." *Id*.

9    at 728. It reasoned that although a damage "process began" when the tank was

10   improperly installed, "[s]tress to the tank did not constitute 'property damage' under the

11   policy as it is not 'physical injury to tangible property[.]'" *Id*. at 735–36.

12        *Walla Walla* is distinguishable from the present case. First, the *Walla Walla*

13   parties did not mention let alone dispute anything resembling a "sudden and accidental

14   physical injury" exception. Nor did *Walla Walla* discuss an impaired property exclusion.

15   Consequently, Inland's argument that the tank's rupture is similar to Wall 4's failure

16   because both were caused by negligent installation is of limited value. Dkt. 36 at 14. The

17   court in *Walla Walla* does not analyze whether this type of failure can be fairly

18   characterized as "sudden and accidental." Second, the nature and cause of the damages

19   suffered in *Walla Walla* are distinguishable from URR's damages. Walla Walla College

20   sought money for "incurred expenses and loss of revenue as the result of the remediation

21   effort required to clean up the pollution caused by the gasoline leak." 149 Wn. App. at

22   728. In contrast, URR does not seek insurance money to reimburse the cost to repair

1   property nor does it discuss any property damage from Wall 4's failure in its

2   counterclaims.

3        URR asserts that it "was unable to sell the project to other, later, buyers, or in one

4   case was asked to take a steep discount, due to the failure of Wall 4." Dkt 33 at 5. It

5   asserts that sellers determined that the failure of Wall 4 and other retaining walls would

6   be discovered during buyer due diligence. *Id*. URR does not explain how the wall's

7   failure was "sudden or accidental." It asserts that "in the months following the failure of

8   wall 4, the City of Ridgefield refused to provide final approval for the project due to un-

9   repaired retaining wall issues, which prevented URR from using the Project as intended –

10  specifically the completion of building lots and sale to a third-party builder who would

11  construct homes on the lots." *Id*. at 2. It asserts that the failure of Wall 4 affected other

12  lots "meaning that they could not be improved and sold to a home builder until the wall

13  was repaired." *Id*. at 5.

14       BITCO argues that Inland failed in its burden to show that the sudden and

15  accidental injury exception applies. It asserts that "there was no sudden and accidental

16  physical injury; rather, there was a defectively constructed retaining wall that never

17  performed as intended." Dkt. 31 at 11. It points to the fact that "two witnesses in the case

18  testified that after completion the wall began to suffer from 'displacement,' and that

19  because of Inland's improper grading, water built up over time behind the wall and it

20  began to suffer from 'tension cracking' and 'slight bulging.'" Dkt. 35 at 9 (quoting Dkt.

21  33 at 4).  It argues that the mere fact that "no damage was observed for an alleged three-

22

1    month period" does not render the discovery of the wall's failure in January 2019 a

2    "sudden and accidental" injury. Dkt. 31 at 11 n. 5.

3        BITCO argues that even if the wall's failure had been the result of a "sudden and

4    accidental" injury, the exception cannot apply because URR's losses were not the result

5    of the wall's failure. It asserts URR's losses were instead the result of buyers concluding

6    that Inland had poor workmanship and consequently losing confidence in the project as a

7    whole. Dkt. 35 at 7; Dkt. 40 at 5. In support, BITCO emphasizes that contracted buyers

8    refused to purchase the land both before and after the wall failure for the same reason:

9    Inland's faulty construction of all the retaining walls. Dkt. 31 at 10–11. The first

10   contracted buyer in November 2018, two months before the wall's actual failure, refused

11   to purchase after the geotechnical report revealed "numerous defects and deficiencies

12   with Plaintiffs work, *including but not limited to*, the retaining walls were not built

13   correctly and in accordance with the approved design plans, there was a substantial risk

14   of future wall failures and displacements, particularly during the wet winter season." Dkt.

15   1-2 at 24 (emphasis added). In sum, BITCO argues,

16       [t]he question is not, as Inland mistakenly argues, whether the wall failure
         of the allegedly faulty workmanship constitute an "occurrence" as defined
17       in the policies. . . . The issue is that Inland cannot demonstrate that the
         exception for loss of use arising out of a 'sudden and accidental' physical
18       injury applies because Inland's alleged faulty workmanship is what caused
         URR to be unable to sell at its desired price point.
19
     Dkt. 40 at 5.
20
         Finally, BITCO argues that the fact that URR did not argue that the failure of Wall
21
22   4 caused its losses in its counterclaims is further evidence that its damages were not the

1   result of a sudden and accidental physical injury. Dkt. 31 at 11. The counterclaims make

2   no mention of the bulging or specifics of the failure of Wall 4. BITCO asserts that,

3   "[d]espite Inland's effort to now re-characterize URR's claims, it is abundantly clear

4   from URR's actual counterclaim that its alleged loss (*i.e.*, its inability to sell for the price

5   it wanted) was the result of the discovery of defective work, and not a physical injury."

6   *Id*. at 12. Inland asserts that the counterclaim made sufficient reference to a wall failure

7   and argues that, "even if URR had omitted the allegation that Wall #4's failure rendered

8   the lots unsaleable from its Counterclaim, URR would have most likely been permitted to

9   amend its pleadings to conform to this evidence. Dkt. 32 at 12 (citing Washington

10  Superior Court Rule 15(b)).

11         The Court concludes that the "sudden and accidental" injury exception does not

12  apply. The record supports that Wall 4's failure was gradual and inevitable rather than

13  "sudden or accidental." Indeed, the only thing surprising about Wall 4's failure is that it

14  was the only retaining wall to visibly fail. Every expert analysis of the walls both before

15  and after Wall 4's failure concluded that all of the retaining walls were likely to fail. First

16  was the geotechnical report commissioned by the first potential buyer in November 2018

17  which warned that that the retaining walls were improperly constructed and likely to fail

18  when wet weather started. Dkt. 1-2 at 24. Geotechnical reports in February and June 2019

19  reached the same conclusion: all the retaining walls were improperly constructed and

20  likely to fail. Dkt. 1-2 at 24 (February report); *Id*. at 27 ("[I]n June 2019, the new third-

21  party purchaser performed geotechnical testing . . . . [It] confirmed that the retaining

22  walls are still not constructed correctly, and will fail in the future."). Inland had two

1   months warning to fix the walls before it discovered that the November report's

2   prediction came true with Wall 4. Nothing about Wall 4's failure was sudden let alone

3   accidental.

4          Even if the failure of the wall constituted a sudden and accidental injury that

5   "occurred" in January of 2019 when the wall's failure was first discovered, Inland fails to

6   show that URR's damages arose from Wall 4's failure. In the parlance of the policy

7   exception, Inland fails to show that URR suffered damages from a "loss of use of other

8   property arising out of sudden and accidental physical injury." Dkt. 1-1 at 319. The

9   record makes plain that the damages arose not from "loss of use of other property," but

10  rather from buyers concluding after due diligence that Inland had poor workmanship and

11  losing confidence in the project. Inland conceded as much where it points out that the

12  "improper installation of this wall *ultimately led to prospective buyers losing confidence*

13  *in the project*, extending the construction duration too far and ultimately led to the

14  developer losing the property . . . ." Dkt. 32 at 11–12 (emphasis added) (quoting Dkt. 25,

15  J2 Report, at 5). The J2 report also reveals that faulty construction issues persisted after

16  wall 4 failed:

17          Once the issue of this improperly constructed and failing retaining wall was
            discovered, all of the same issues/concerns discussed above continued
18          throughout the re-construction process. The initial retaining wall repair was
            not performed in accordance with SWT's recommendations, there was a
19          lack of manpower to complete the wall, there was poor workmanship, and
            there were several unexplained schedule delays.
20
    Dkt. 25 at 8. Indeed, buyers in July 2019 refused to purchase at a profit not just because
21
    of Wall 4's failure, but because of faulty construction in all of the retaining walls. Dkt.
22

34-7 at 1 ("As we have discussed, we cannot move forward with this project due to concerns over the retaining wall*s*.") (emphasis added).

Furthermore, the problems that scared off buyers identified in the J2 Report are not limited to faulty initial construction and faulty reconstruction of Wall 4. They include other details of Inland's poor workmanship in various aspects of the project as a whole. For example, it noted "reports of crews working without a set of plans which caused improper grading and pipe placement that needed to be re-excavated and replaced," and that "[d]uring investigating the failure at retaining wall #4, it was discovered that the geogrid was not installed properly, and compaction was inconsistent in some areas." Dkt. 25 at 6. The report states that it is "not clear why this grading change (taller retaining wall) went unreported and seemingly unnoticed for 3 months until improper grade/slope, and resultant ponding was observed as well as wall failure." *Id*. at 7.

The evidence that buyers were deterred by Inland's faulty construction in numerous aspects of the Project undermines the argument that a "loss of use of other property" after a "sudden and accidental physical injury" caused URR's damages. The record is clear that URR's damages arose from buyers "losing confidence" in the project because of Inlands improper installation and other failures highlighted in the J2 Report and the earlier November 2018 geotechnical report.

The absence of a discussion of Wall 4's actual failure or loss of use of property afterwards from URR's counterclaims further supports this conclusion. When insurers discern whether they have a duty to defend an insured, they are guided by the "eight corners rule" to determine whether, on the face of the complaint and the insurance policy,

1    there is an issue of fact or law that could conceivably result in coverage under the policy.

2    *Xia*, 188 Wn.2d at 182. BITCO apparently concluded that URR's counterclaim was

3    "conceivably" covered. But the duty to indemnify is much narrower. *Woo*, 161 Wn.2d at

4    53. It "exists only if the insurance policy actually covers the insured's liability." *Mut. of*

5    *Enumclaw Ins. Co.,* 103 Wn. App. at 58. The burden to show that URR's damages arose

6    from a sudden and accidental injury is on Inland. URR's counterclaim did not allege that

7    Inland's faulty construction suddenly or accidentally caused an impairment of its

8    property, and there is no evidence supporting that conclusion.

9          URR was not able to sell the Project at a profit not because Wall 4 failed as

10   predicted, but because potential buyers discovered Inland's widespread faulty

11   construction and refused to pay the price URR wanted. The "sudden and accidental

12   injury" exception does not apply, and the damages URR suffered is the result of Inland's

13   defective work, which is not covered by BITCO's policy as a matter of law.

14                                **III.  ORDER**

15         Therefore, it is hereby **ORDERED** that BITCO's motion for partial summary

16   judgment, Dkt. 35, is **GRANTED**. Inlands motion for partial summary judgement, Dkt.

17   24, is **DENIED**.

18         Dated this 22nd day of August, 2024.

19

20

21                              _____
                                BENJAMIN H. SETTLE
                                United States District Judge
22